## P. M. BARGER LUMBER CO. v. WHITE-HOUSE et al.

### No. 12315.

United States Court of Appeals,
Ninth Circuit.

June 6, 1950.

Leo Levenson, W. J. Prendergast, Jr., Portland, Or., for appellant.

Otto F. Vonderheit and Stanley R. Darling, Eugene, Or., for appellees.

Before HEALY, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

P. M. Barger Lumber Co., a North Carolina Corporation, herein called Barger, brought this action against J. L. Whitehouse, a citizen of Oregon, in the lumber business at Eugene, Ore., under the name Interstate Lumber Sales, and Interstate Lumber Sales, Inc., an Oregon corporation, both herein called Interstate, to recover damages for breach of warranty of quality of a carload of wood doors which Barger claims to have purchased from Interstate. Interstate successfully asserted that it did not sell the doors to Barger, but to one Ruth Meyer, a wholesale lumber dealer, who in turn sold to Barger. Barger, on the other hand, contended that Meyer, in ordering the doors from Interstate, acted as a broker or agent for Barger, an undisclosed, or partially undisclosed principal, and that the result of this is that the sale was one made by Interstate to Barger. The principal finding was "that the doors were purchased from the defendant * * by Ruth Meyer in her capacity as an independent wholesale lumber dealer and not as an agent of the plaintiff."

Barger was a wholesaler of millwork and other lumber products at Statesville, N.C. It had previously done some business with Ruth Meyer who had a place of business, or office, in the Davis Building in Portland. On January 10, 1948, M yer learned, through a telephone conversation with one Lytle, who was employed by Interstate on a commission basis as a "finder" of lumber and lumber products, that Lytle had been offered this carload of doors by the manufacturer in California. She was advised of the description and price of the doors. She said she would see if she could find a customer, and call back. Meyer immediately telephoned Barger, stating that she had a car of F-82 doors, and priced them to Barger. Barger's president testified that he "instructed her to buy it for us." Thereupon she telephoned Lytle that she had found a customer and wanted the doors. The same day, by letter, she "confirmed purchase of this car for shipment to Barger". As soon as Lytle knew of Meyer's telephoned order he telephoned Interstate who wired the manufacturer to ship the car of doors. January 12, Meyer executed a purchase order, addressed to Interstate [1] and directing shipment to Barger. The order was accepted in writing dated January 14.

Pursuant to a telegraphed request from Meyer, Barger, through his bank, guaranteed payment for the car. The manufacturer, in California, invoiced the shipment to Interstate and drew on Interstate for its price for the doors. Interstate invoiced

---

[1] During the earlier portion of the events here related, Whitehouse, with another, did business under the name "Austin Dodds Company". Thereafter he first dealt as Interstate Lumber Sales, and then incorporated "Interstate Lumber Sales, Inc." Some of the correspondence here described was addressed to, or signed in the name of Austin Dodds Company. The changes of name are not significant here.

the same goods to Meyer. The invoice recited: "Sold to Ruth Meyer".

The carload of doors was shipped, and on its way toward North Carolina, by January 12. The manufacturer's draft, attached to bill of lading, was paid by Interstate at its Eugene, Ore., bank on January 15. Thereupon Interstate drew on Meyer, care of Bank of California, at Portland, with order bill of lading attached. The draft was paid by Bank of California in consequence of its having received the guarantee from Barger's North Carolina bank. Payment was credited at Interstate's Eugene, Oregon, bank on January 19. Meyer thus came into possession of the shipping papers, and attached the order bill of lading to her own invoice to Barger.

When the doors reached North Carolina it was found that they were not F-82 doors, as such are known in the trade, and in other respects failed to meet the specifications stated in the invoices. Interstate does not seriously question the assertion of breach of warranty as between Barger and whoever sold to it,[2] but asserts that no contractual relationship existed between Interstate and Barger, and hence that it made no warranty to Barger.

For the purpose of showing that it was the principal in the purchase of the doors from Interstate, Barger introduced in evidence a number of letters exchanged by it and Interstate after the defects in the merchandise appeared. These letters, it is said, show that Interstate, by its subsequent conduct, recognized and admitted its status as a seller to Barger. The nature of this correspondence is illustrated by Exhibit 4, a letter from Interstate to Barger dated June 25, 1948, offering to refund $915 in settlement of Barger's claim. It referred to the car as "sold to you thru Ruth Meyer", related the efforts made to get an adjustment from the manufacturer, stated "we feel responsible for this shipment", and said: "We

have always stood behind our shipments. * * * and tried to work out settlement with the customer that is both fair and reasonable. Ruth Meyer who handled this order for you in Portland is of the same opinion and she too has agreed to put up $300 as her contribution in making up a settlement to you."

Barger also lays much emphasis upon the form of Meyer's purchase order. It bore date January 12, 1947 [sic] and was headed "Ruth Meyer" below which was typed the word "agent". It was marked "Purchase Order No. 184", was addressed to Interstate and recited "Ship to Barger Millwork Co., Statesville, N. C." with description of the car of doors, statement of the price, and directions for routing shipment.

Barger also makes much of the fact that Meyer's only equipment was an office and a telephone. She had no yard, or other facilities for handling lumber or lumber products, and was apparently without means or credit sufficient for the handling of a purchase of this size by herself. Both parties had previously dealt with her, and knew something of her business, and because of her limited credit and facilities it is argued that all parties must have understood that she could function only as an intermediary.

On behalf of Interstate our attention is called to the fact that Interstate's invoice of the shipment recited "Sold to Ruth Meyer". This followed by five days Meyer's letter to Lytle of January 10, 1948, written below her letterhead "Ruth Meyer, Wholesale Lumber", stating she had by telephone "confirmed purchase of this car for shipment to Barger." In the same letter she referred to Barger as "my customer". (Meyer was not a witness as she had been lost in a plane crash prior to the trial.) It thus appears that Barger's name was known when the doors were invoiced

---

2. Interstate sent one of its men to interview the manufacturer in an effort to obtain an adjustment for Barger. In his instructions to this emissary, Interstate's manager said: "In attempting to make a settlement on these I asked for a dollar per door rebate and figured that we could probably get back a quarter from Ruth Meyer per door which would at least pay the guy his freight on his load of junk and give him about four bits a door to lop off the price."

to Meyer. The fifteen hundred doors, price to Interstate at $7.60 each, less 2 percent, were billed to Meyer at $8.15 each. She, in turn, invoiced them as sold to Barger at $8.40 each.

The president of Barger, who acted for it, testified that when he made his deal he had no knowledge of what Meyer paid for the doors, since "her commission was of no direct effect on me. What I paid her for them is my primary interest." The same witness was asked if it would have made any difference to him if Meyer, after he had ordered it, had sold this carload to some one else. He replied, "Well, I hardly know."

Testimony was received tending to show that Ruth Meyer had held herself out as a wholesale lumber dealer. Her stationery carried a letterhead with the words "Wholesale Lumber" under her name. She was listed in the Lumbermen's Red Book as a wholesale lumber dealer.[3]

It is apparent that the facts in the case presented to the trial judge one of those mixed situations which commonly arise when parties carry on dealings without giving any thought to just what sort of relationship they are creating and without anticipating that any difficulties may arise to make an exact definition of their relationship important. This is the sort of ambiguous arrangement which Mr. Mechem describes in his works on Sales and on Agency.[4] Some of the things done strongly suggest that the arrangement was an agency. Others as emphatically indicate a sale between Meyer and Barger. No single item of the evidence appears to be conclusive. Interstate's letter of June 25, 1948, appears on its face to contain an admission of responsibility to Barger. Interstate explained it as a mere voluntary effort to use its good offices to get an adjustment from the manufacturer.

The insertion of the word "agent" after the name of Ruth Meyer on the formal purchase order, if it stood alone, would have significance. Interstate points to the fact that the deal had been completed, and the car was on its way before this purchase order had been received. It must be considered with the equally formal invoice which recited "Sold to Ruth Meyer". It will be recalled that on the date of this invoice, January 15, Interstate knew that Barger was Meyer's customer. If Barger was a principal it was not an undisclosed one. Under these circumstances whether Barger acquired a right to look to Interstate would be a question of fact.[5] We also think that the fact that shipment was made by an order bill of lading does not aid in the solution of the problem. Use of such a bill of lading would be a normal procedure whether Meyer was purchaser or agent for the purchaser.

Tending to show an absence of agency is the fact that Barger was not concerned with what Meyer paid for the doors. She made as profit the difference between her price to Barger, and what the doors cost her. This again, although indicative of an absence of a fiduciary relationship, is not conclusive, for an agency does not necessarily exclude the possibility of compensating the agent in that manner. Cf. McCullough v. Porter, 4 Watts & S. 177, 4 Pa. 177, 39 Am.Dec. 68.

An impressive indication that Meyer was a mere intermediary, and that Barger did

---

3. There was also testimony that under the usages and customs of the lumber trade a "wholesale lumber dealer" is one who is in the business of buying and selling lumber, while a "commission man" is one who buys or sells lumber for someone else. This would appear to be equivalent to saying that according to the usages and customs of the trade a wholesale lumber dealer is a dealer in lumber at wholesale, and a commission man is a man who earns commissions. We doubt if the court was much enlightened by this testimony.

4. Mechem on Sales, Sec. 41, et seq. Mechem on Agency, 2nd Ed., Sec. 44.

5. A like question of fact would arise if Interstate had sued Barger for the price. See Calder v. Dobell, L.R. 6 C.P. 486, discussed in Mechem, Agency, 2nd Ed. Secs. 1713, 1714, and 2055. Compare Rea v. Barker, C.C.Or., 135 F. 890, with Simonds v. Wrightman, 36 Or. 120, 58 P. 1100.

not intend to deal with her as a principal, is her want of financial standing. She had no apparent resources other than her office and telephone. At this more remote distance, it would appear hard to understand how an established business organization like Barger would choose to buy its merchandise "sight unseen" from a person who owned nothing, dealing with her as a principal.

The evidence shows, however, that although the seller's market vanished 2 or 3 months later when the market on lumber products began to fall off, yet at the time when this purchase was made by Barger doors were so scarce that in the scramble for such building materials all parties concerned were willing to take abnormal chances. The manufacturer, which on later investigation turned out to be operating without competent management, and tottering on the edge of bankruptcy, was able to sell to Interstate, which apparently bought without inspection or other investigation, and without even exacting a description of the merchandise.[6] We think it must have been apparent to the trial judge that in like manner Barger, like many others who were inordinately eager for merchandise during the period of the war and years following, may have been willing to take the chances which dealing with a person in the position of Meyer involved. In this situation it was apparently so grateful to Meyer for having favored it with the opportunity to buy this "load of junk", that it did business with its guard down, and permitted its arrangements to fall into this ambiguous pattern.

We are therefore of the opinion that what the arrangement was, whether one of agency or of sale, was a question of fact which was for the trial court to determine. We cannot say that the finding was clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

Judgment affirmed.

6. Interstate paid for the doors on the assumption that they were F-82 doors, all grade A except for 2% grade B. The invoice from the manufacturer contained no description other than "Douglas Fir Doors" and the only reference to grade was "2% B Doors".